920 So.2d 278 (2005)
STATE of Louisiana
v.
Rynell DOBBINS.
No. 05-KA-342.
Court of Appeal of Louisiana, Fifth Circuit.
December 27, 2005.
*280 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Desiree M. Valenti, Thomas S. Block, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., CLARENCE E. McMANUS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On June 12, 2003, a Jefferson Parish Grand Jury returned an indictment against defendant, Rynell Dobbins, for second degree murder in violation of LSA-R.S. 14:30.1. Defendant was arraigned on June 16, 2003 and pled not guilty. On October 22, 2003, the trial court found defendant competent to stand trial. Defendant's motions to suppress confession, evidence, and identification were denied on November 14, 2003. On March 23 and 24, 2004, the case was tried before a 12-person jury which found defendant guilty as charged.
On April 13, 2004, the trial court denied defendant's motion for new trial. On that same date, defendant waived sentencing delays, and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The trial court denied defendant's motion to reconsider sentence, but granted his motion for appeal.

FACTS
At trial, Louisiana State Trooper John Neal testified that he and the victim, Harry Bruno, were friends who spoke several times a week. On Tuesday, April 15, 2003, Trooper Neal received a telephone call from Bruno's employer at River Oaks Medical Center who said that Bruno, a substance abuse counselor, had not come to work the entire weekend. After the apartment manager let Trooper Neal into Bruno's apartment at 4289 Lac St. Pierre, Trooper Neal discovered Bruno's body in the master bedroom and called the police.
Detective Donald Meunier of the Jefferson Parish Sheriff's Office (JPSO) testified that, on April 15, 2003, he was called to the scene. He noted that Bruno's body had apparently been there for a few days, the door showed no sign of forced entry, the bedrooms were in disarray, and the television and other items appeared to be missing. Trooper Neal advised Detective Meunier that Bruno's vehicle was also missing.
*281 Detective Meunier testified that an article regarding the homicide appeared in the Times-Picayune newspaper on April 16, 2003. On that same date, defendant arrived at the detective bureau with a copy of the newspaper article and gave four statements.
In his first statement dated April 16, 2003 at 5:25 p.m., defendant said that he wanted to turn himself in relative to the incident at 4289 Lac St. Pierre. He explained that on Saturday, April 12, 2003, he went to see Bruno, his friend of four years, because Bruno owed him $200.00. When Bruno refused to give defendant the money, defendant attempted to pick up the telephone to call "Ronald" for a ride. Before defendant could dial the number, Bruno jumped up, snatched the receiver out of defendant's hand, pushed defendant against the wall and told him to get out.
Defendant told Bruno that he needed to use the telephone because he was not going to walk from the apartment, and he attempted to pick up the telephone again. Bruno ran at him, slammed the receiver down, and pushed him, insisting defendant get out of his house. Defendant picked up a hammer and told Bruno that he was going to use the telephone. Bruno knocked defendant's hand out of the way and grabbed his shirt, so defendant hit Bruno in the head with the hammer. Bruno fell on the bed, but got up and lunged at defendant. Bruno tried to pin defendant's arm behind his shoulder, so defendant hit him in the head with the hammer a second time. Bruno, who still had a strong hold on defendant, spun defendant around, so defendant hit him in the head with the hammer a third time. Defendant said that Bruno fell on the floor and was spitting up blood. Defendant dropped the hammer and sat on the bed, trying to figure out what to do. He knew he had to leave town, so he took $110.00 in cash from a black bag in the master bedroom. Then, defendant used Bruno's cell phone to call a cab.
Defendant stated that he stayed at a hotel on Saturday night, but he went back to Bruno's house the next day and let himself in with Bruno's keys to make sure Bruno was alright. Defendant said that Bruno was still on the floor face down in the exact position that he left him in. Defendant then moved Bruno's car to a complex on Manhattan Boulevard to delay someone finding out what happened. He said that he did not take any property from the apartment other than the money, a cell phone, and the car. Defendant stated that Bruno was a friend, and that he felt remorse.
In his second statement dated April 16, 2003 at 6:20 p.m., defendant said that he had told some untruths in his first statement. Defendant admitted that he also took a television, a DVD player, a VCR, and a few DVD's and VCR tapes from Bruno's apartment on Sunday, April 13th, and that he sold the items to a woman at the Villa D'Ames apartment complex for $50.00. Defendant further stated that he retrieved Bruno's vehicle and sold it to a man for approximately $40.00 and some crack cocaine.
In his third statement dated April 16, 2003 at 6:46 p.m., when asked if he used anything other than a hammer in the fight, defendant said that he snatched the phone jack and a couple of wires out of the wall. However, he only remembered choking Bruno with his hands for a minute or two when he saw Bruno regaining consciousness. Defendant stated that Bruno was on the ground face down when he choked him after the hammer broke.
In his fourth statement dated April 16, 2003 at 8:51 p.m., defendant said that he also took a stereo from Bruno's apartment and sold it to the woman at the Villa *282 D'Ames apartments. He further stated that he sold the television to "Chris" who was with the woman, but that "Chris" and his friends pulled a gun on him when he tried to collect the money. Defendant said that he went to Bruno's apartment on Monday, April 14th to clean himself up and get something to eat.
At trial, Alice Jasmine testified that she purchased a stereo, speakers, a DVD player, and a VCR from defendant for $50.00. Brandon Porea testified that he purchased a red Grand Am from defendant for $350.00. Delana Porea testified that she gave her son, Brandon, $350.00 to buy a car.
Timothy Scanlan, an expert in forensic science, crime scene reconstruction, and blood stain evidence analysis, testified that there was a ligature (a device used for strangulation) tied around the victim's neck, and that the ligature was tied in knots, which he explained meant that the person looped it over the victim's head and pulled with their hands crossed to get it tight. Mr. Scanlan further testified that, based on blood stain evidence analysis, the victim was on his hands and knees 12 to 18 inches from the ground in a prone position while being struck multiple times in the back of the head.
Mr. Scanlan identified photographs of a broken hammer that was used in the attack. He testified that quite a bit of force would have to have been generated to cause the blood stain evidence that he observed. He explained that the evidence showed that someone with a complete swing of the hand came down and all the way back, and that blood was cast from that object at a high rate of speed.
Dr. Susan Garcia, a stipulated expert in the field of forensic pathology, testified that, on April 16, 2003, she performed an autopsy on Bruno who was 5'6" and weighed 257 pounds. Dr. Garcia testified that Bruno received blunt force trauma to the front and back of his head: three blows to the front of the head and four to the back. She explained that the wounds to the head were consistent with being hit with a hammer. Dr. Garcia further testified that the victim would not have died from the head wounds, but he would have been disoriented from them. She explained that the cause of death was strangulation, and that the cord needed constant pressure to accomplish its goal, considering the type of knot she observed. She also testified that no defensive wounds were found on decedent.
Sergeant Virgil McKenzie, a stipulated expert in the field of fingerprint identification and comparison, testified that defendant's fingerprints were found on a mayonnaise jar located in Bruno's kitchen, a cola can and Doritos chip bag found in Bruno's second bedroom, and a cola can found in the bathroom.

DISCUSSION
On appeal, defendant assigns three errors. It is well established that, when issues are raised both as to the sufficiency of the evidence and as to one or more trial errors, the sufficiency of the evidence should be determined first. State v. Hearold, 603 So.2d 731, 734 (La.1992). Accordingly, because defendant's second assignment of error questions the sufficiency of the evidence, we consider this assignment of error first.
In his second assignment of error, defendant contends that the evidence was insufficient to support a second degree murder conviction, and that the evidence proved, at best, that the killing was a manslaughter done in the heat of passion. The state responds that, after viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt that *283 defendant was guilty of second degree murder.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). In a criminal case, the reviewing court must not impinge on the jury's factfinding prerogative, except to the extent necessary to guarantee constitutional due process. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. In cases involving circumstantial evidence, the reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). Rather, the reviewing court must evaluate the evidence in the light most favorable to the prosecution and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.
Defendant was convicted of second degree murder in violation of LSA-R.S. 14:30.1, which provides in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
To prove second degree murder under LSA-R.S. 14:30.1 A(1), the state was required to show: (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from circumstances and actions of the accused, as well as the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
In this case, defendant does not deny that he killed Bruno; rather, he argues that Bruno's refusal to allow him to use the telephone and Bruno's physical attack upon him was sufficient provocation to reduce the murder conviction to manslaughter, a lesser included verdict to second degree murder.
According to LSA-R.S. 14:31 A(1), manslaughter is a homicide that would be a first or second degree murder, but it is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have *284 cooled, at the time the offense was committed. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors which may reduce the grade of the offense. State v. Johnson, 01-1362 (La. App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
In the instant case, defendant admitted in his statements that he hit the victim in the head with a hammer and choked him when he saw the victim regaining consciousness. At trial, Dr. Garcia testified that the victim received seven blows to the head and was strangled to death with a cord. She stated that it would have taken significant and constant pressure to kill the victim, based on the way that the cord was knotted. She further testified that Bruno did not have any defensive wounds, indicating that the victim was disabled when he was being strangled. Mr. Scanlan testified that the victim was 12 to 18 inches from the ground on his hands and knees when he received the four blows to the back of the head, and that the victim was essentially a "non-moving target" when he received those blows.
A reasonable jury could have inferred from defendant's actions that he had the specific intent to kill Bruno. Further, the evidence supports the finding that defendant did not meet his burden of proving that he acted in sudden passion or heat of blood. Rather, the evidence reflects that defendant deliberately choked Bruno when he saw that Bruno was regaining consciousness. Based on the evidence regarding defendant's actions and the extent of the victims' injuries, we find that a rational trier of fact could have found beyond a reasonable doubt that defendant had the requisite intent to kill Bruno. Therefore, the evidence was sufficient to support a conviction for second degree murder under LSA-R.S. 14:30.1 A(1), and this assignment of error is without merit.[1]
In his first assignment of error, defendant argues that the trial court erred by permitting the state to introduce inadmissible other crimes evidence, specifically his statements that he had "been in trouble before." The state responds that the statements in question did not constitute other crimes evidence or, alternatively, that their admission was harmless error.
In his first statement to police, defendant explained that he and Bruno had gotten into an argument, that he hit Bruno in the head with a hammer three times, that Bruno fell to the floor and did not move much, and that, afterwards, he sat down to figure out what he should do next. During that explanation, defendant said, "[s]o I had been in trouble before like I said I never been in quite that I was scared (sic)." Later in his first statement, defendant stated, "[l]ike I said I've been in trouble before but never nothing like that you know I never I'm not a violent person *285 I've never you know beaten anybody or done anything you know (sic)."
On March 22, 2004, the state filed a notice of intent to use evidence of other crimes. In that notice, the state indicated that it was seeking to introduce the portion of defendant's first statement wherein he stated that he "had been in trouble before." On March 23, 2004, prior to opening statements, the prosecutor said that, out of an abundance of caution, he had filed a LSA-C.E. art. 404 B notice to include defendant's statements that he "had been in trouble before." Defense counsel objected, but the trial judge overruled the objection.
Evidence of other crimes or bad acts committed by a criminal defendant is generally not admissible at trial. LSA-C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, such evidence may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule when it tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. The defendant bears the burden to show that he was prejudiced by the admission of other crimes evidence. Id. at 165-166. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404(B)(1) will not be disturbed. State v. Merritt, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
In the present case, defendant did not refer to any specific crime or bad act that he committed when he stated that he had "been in trouble before." Thus, we find that defendant's comments were ambiguous and were not improper references to other crimes or bad acts. Accordingly, the trial court did not err in overruling defendant's objection to the admission of defendant's statements that he had "been in trouble before," and this assignment of error is without merit.
In his third assignment of error, defendant asserts that it was error to permit a purported "expert" witness, Detective Meunier, to totally usurp the role of the jury by giving expert testimony as to whether defendant was being truthful during his statements. The state responds that Meunier was not an expert witness, and that he testified only as to his role and observations in the investigation.
During the direct examination of Detective Meunier, the prosecutor asked the detective whether defendant admitted to removing the victim's DVD player, VCR, or stereo. Meunier responded negatively, and stated that defendant only admitted to taking $110.00 cash, a cell phone, and the car. The prosecutor asked the detective if he believed defendant was being truthful with him, and the detective responded negatively. Defense counsel objected as to relevancy, but the trial judge overruled the objection.
Later, the prosecutor asked Detective Meunier whether defendant appeared contrite or sorry as he recounted the events in his statement, and Meunier responded, "[n]o." Defense counsel renewed his objection, and the trial judge ruled that the detective could describe what he observed in terms of defendant's demeanor.
Afterwards, the following exchange occurred:
THE STATE:
Q. Based upon the information that you had gleaned from the crime scene, at the conclusion of the second statement did you believe that the Defendant was telling you the truth?
*286 DET. MEUNIER:
A. No. He's still not telling the truth at that point. He still hasn't addressed the issue of the additional blows to the head with the hammer, he still hasn't addressed the issue of the cause of death, the strangulation, the electrical cord that we discovered around the victim's neck when we went in the apartment. No, he's not telling the truth. He was telling the truth about  ultimately was determined to be telling the truth about some property items that he now acknowledged taking out of the apartment. We were able to confirm that part as truthful. But with respect to the act, itself, the murder itself, no.
Defense counsel renewed his objection and moved for a mistrial. The trial judge said, "[i]t's noted."
The prosecutor then played the audiotape of defendant's third statement for the jury.
The following exchange occurred a short time later:
THE STATE:
Q. Based on the your (sic) review of the scene and all the evidence at that scene, did you believe he had been telling you the truth up until this point.
DET. MEUNIER:
A. No.
Defense counsel renewed his objection which was overruled by the trial judge.
LSA-C.E. art. 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. The jury as the ultimate fact finder should relate background knowledge received from the expert to the facts established by the evidence at trial, and make a determination of the defendant's guilt. State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1080, writs denied, 94-0475 (La.4/4/94), 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055. An expert witness shall not express an opinion as to the guilt or innocence of the accused. LSA-C.E. art. 704.
In the instant case, the record reflects that Detective Meunier was never tendered as an expert witness. Additionally, Meunier did not testify as to the general truthfulness of defendant nor did he testify as to whether he thought defendant was guilty or innocent. Rather, the record shows that the prosecutor elicited relevant testimony from Meunier as to whether defendant's version of events was consistent with the evidence found at the crime scene.
Detective Meunier testified that he did not believe defendant was being truthful when he said he had only taken the victim's cash, cell phone, and car, because the outline of dust on the table in the master bedroom indicated that a television and other items appeared to be missing. Also, Meunier testified that he thought defendant was not telling the complete truth regarding the homicide, because he knew that the victim had died from strangulation, yet defendant had only admitted hitting the victim with a hammer.
In light of the foregoing, we find that the trial court did not err in overruling defendant's objections to the testimony in question. Accordingly, this assignment of error is without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); *287 State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors requiring corrective action.

DECREE
For the reasons set forth above, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The state presented its case under both the specific intent and felony murder theories of second degree murder. However, based on our finding that there was sufficient evidence to show that defendant had the specific intent to kill or inflict great bodily harm, we need not address whether or not the evidence was sufficient to support his conviction based on the felony murder theory.