SUSAN M. CHEHARDY, Judge.
 

 |2On November 4, 2004, the Jefferson Parish Grand Jury issued an indictment charging defendant, Josh Bauman, with second degree murder, a violation of La. R.S. 14:30.1. Defendant pled not guilty at his arraignment.
 

 On June 14, 2006, defendant filed various pre-trial motions, including a motion to suppress the evidence. On September 28, 2006, defendant filed a Motion to Appoint a Sanity Commission to Determine Competency to Stand Trial. After the competency hearing, defendant was found competent to stand trial on December 7, 2007.
 

 The trial court heard and denied defendant’s motion to suppress evidence on January 11, 2008. Defendant applied to this Court for sujoervisory writs. This Court found no error in the trial court’s denial of defendant’s motion to suppress evidence.
 
 State v. Bauman,
 
 08-98 (La.App. 5 Cir. 2/8/08), (unpublished writ disposition). The Louisiana Supreme Court denied defendant’s writ of certiorari.
 
 State v. Bauman,
 
 08-0402 (La.2/25/08), 976 So.2d 1291.
 

 On May 13, 2008, defendant proceeded to trial before a twelve-person jury. On May 14, 2008, the jury unanimously found defendant guilty as charged. On |3June 6, 2008, the trial court sentenced defendant to life imprisonment without benefit of parole, probation, or suspension of sentence.
 

 On appeal, defendant seeks review of his conviction and sentence raising two assignments of error: the trial judge erred in denying the motion to suppress evidence and the evidence was insufficient to find defendant guilty of second degree murder. Of note, on January 6, 2009, this Court granted defendant leave to file a
 
 pro se
 
 supplemental brief in this matter. To date, this brief has not been filed.
 

 Testimony of witnesses at pre-trial suppression hearings and at trial revealed the following facts. Brandy Ronquille testified that she and Michelle Bauman were longtime friends and co-workers. Ronquille stated that they worked at International Drug Detection (“IDD”). Their office was one of six businesses located at 7521 West-bank Expressway in Marrero, Louisiana. On September 7, 2004, Ms. Ronquille left the office, as usual, at about 11:00 a.m. to get lunch from a nearby restaurant. When Ms. Ronquille left the office, Ms. Bauman was alone in their office doing paperwork.
 

 Joann McKnight, who had been good friends with Michelle Bauman for ten years, worked at a doctor’s office two doors down from Michelle’s office. On the morning of September 7, 2004, a patient entered her office saying that a woman
 
 *181
 
 was outside screaming that her husband had shot her. When Ms. McKnight went outside, she saw Ms. Bauman lying on the sidewalk between their offices. She held Ms. Bauman’s hand and talked to her; Ms. Bauman tried to say something to her, but she was unable to speak. McKnight’s employer, Dr. Vo, came outside to help Ms. Bauman.
 

 Dr. Fong Vo, who has an internal medicine practice at 7521 Westbank Expressway, worked with Michelle Bauman for four years. Dr. Vo testified that, at |,ground noon, on September 7, 2004, he was examining patients when he heard people shouting in the front of his office. He went to investigate, and found Ms. Bauman on the ground outside the entryway to his office. Ms. Bauman was lying face-down. He turned her over and saw a lot of blood in her right eye. He found an entry wound in her cheek. Ms. Bauman was not talking. She was grunting and moaning. Dr. Vo attempted to provide medical treatment to Michelle Bauman.
 

 While Dr. Vo was tending to Michelle, Ms. McKnight went to the IDD office to look for Ms. Ronquille. When Ms. McKnight entered the IDD offices, she saw a man sitting on the floor, slumped against a wall with his legs straight out. She did not immediately recognize him. Ms. McKnight called 9-1-1 from a telephone in the IDD office. While she spoke to the 9-1-1 operator, she realized that the injured man was Josh Bauman.
 
 [1]
 
 At that point, Josh Bauman picked up the gun, and Ms. McKnight thought he was going to shoot her. Instead, he pointed the gun at his own head. Ms. McKnight immediately fled the IDD office.
 

 Debra Guidroz, who worked for Dr. Vo in the same building as Michelle, called 9-1-1 from her office, when she heard that there was a woman, who was bleeding, outside calling for help because her husband had shot her. After calling for help, Ms. Guidroz, who had known and worked with Michelle Bauman since 1994, went to the IDD office. When she entered the office, she saw a man, with blood on his head and shirt, sitting on the floor leaning against the wall. A gun was lying on his chest/stomach area. Ms. Guidroz testified she did not see anyone else inside the IDD office, nor did she see anyone fleeing the scene.
 

 Deputy Paul Sperandeo of the' Jefferson Parish Sheriffs Office testified that, at about noon on September 7, 2004, he responded to a reported shooting at 7521 IsWestbank Expressway in Marrero, Louisiana.
 
 [2]
 
 He and his partner arrived at the scene less than five minutes after receiving the report.
 

 Deputy Sperandeo testified that, when he and his partner approached the business, several people standing outside told them, “ ‘He’s in there, he’s in there.’ ” An injured woman was lying on the sidewalk near the doorway, and someone was giving her medical assistance.
 

 When Deputy Sperandeo entered the business, he saw a man sitting on the floor, leaning against a wall. There was blood on his head and body, and he was unresponsive. There was a chrome revolver lying between his right arm and his body. The barrel of the gun pointed towards defendant’s head. Wflien paramedics ar
 
 *182
 
 rived to assist defendant, Deputy Speran-deo’s partner retrieved the gun.
 

 Homicide Detective David Morales, who was the lead investigator of the shootings, arrived to find a 1994 Buick Century with a Missouri license plate parked at an odd angle in the parking lot. Through a computer search, Detective Morales learned that the car was registered to Danny Bau-man from Ridgedale, Missouri. The car’s front windows were rolled down, and Detective Morales saw a handwritten note on the front passenger seat. The note read, “ ‘Judy and Danny Bauman, 417-239-1154, call and tell them I love them and I am sorry. Josh.’ ”
 

 Detective Morales seized the note and called the telephone number on the note. He learned that Josh Bauman had been living with his parents, Danny and Judy, in Ridgedale, Missouri, until three days earlier. Detective Morales made arrangements to have the car towed to the detective bureau, and he later obtained a warrant to search the vehicle.
 

 | (¡Detective Morales testified that Sergeant Rodney Newman collected a .22 caliber Smith and Wesson revolver from the injured man. The chamber of the gun contained six spent cartridge casings, indicating that it had been fired six times. A lead bullet fragment was found on the floor in the IDD office where the shootings occurred. Detective Morales traced the weapon through the Bureau of Alcohol, Tobacco, Firearms, and Explosives (“ATF”), and determined it was purchased by Danny Bauman, defendant’s father.
 

 Michelle Bauman was pronounced dead on arrival at the hospital. Detective Morales arrested Josh Bauman for second degree murder within an hour of the shootings.
 

 Dr. Susan Garcia of the Jefferson Parish Forensic Center, who was accepted as an expert in forensic pathology, performed an autopsy on Michelle Bauman’s body on September 8, 2004. Her autopsy report was introduced into the record at trial.
 

 Dr. Garcia testified that Ms. Bauman had three entrance gunshot wounds and one exit wound. Ms. Bauman had one entrance wound on the right side of Ms. Bauman’s head lateral to the eye. The exit wound that corresponded with the first entrance wound was through the victim’s right eye socket. A second wound was on Ms. Bauman’s right cheek around the lip area. Wound three was in the mid-back area. . Ms. Bauman also had a graze wound on her right shoulder. The victim had non-firearm injuries to her anterior chest and her left knee, consistent with scraping her skin against a rough surface such as concrete.
 

 Dr. Garcia testified that the lethal wound was the one to the victim’s back, which caused injury to the right lung and a great deal of internal bleeding. Dr. Garcia classified Ms. Bauman’s death as a homicide.
 

 |7The trial court accepted Joel O’Lear as an expert in forensic firearms analysis and identification, and tool mark evaluation. Mr. O’Lear testified that he examined the .22 caliber Smith and Wesson revolver, six cartridge casings, one unknown caliber lead-like fragment, two unknown caliber lead-like projectiles, and a group of small lead-like fragments. Mr. O’Lear testified that the six cartridge casings were all .22 caliber class and were all fired from the same gun to the exclusion of all other weapons.
 

 Defendant also testified in his own behalf. He had lived in Jefferson Parish all of his life, except for the year before the shooting, which he spent living with his parents in Missouri. He had returned to Louisiana three days before the shooting
 
 *183
 
 to take a job as a welder. He was staying in a motel.
 

 Defendant and Michelle met during the 1980s. They were married in 2000, and divorced in 2003. During their thirteen-year relationship, they had one daughter, Logan, who was six years old when they divorced.
 

 Defendant testified that, on the morning of September 7, 2004, he drank a case and a half of beer while he drove around Gret-na. When he called Ms. Bauman at her office to discuss their daughter, Ms. Bau-man hung up on him. Because he was “aggravated” and “mad,” defendant “flew over there to her work” to confront Michelle. Before he left his car, he wrote a note for his parents, which he left on the front seat of the car. He stated that he wrote the note because he knew that he would be going to jail “eventually ... because of the stupid thing” he did.
 

 Defendant, armed with his father’s gun, entered Michelle’s office. He was carrying the gun to deter anyone from impeding his conversation with his ex-wife. He also admitted that he thought the gun might “scare” Michelle into letting him see his daughter. When Ms. Bauman questioned him about his intent, he told her |8that he had come to finish their telephone conversation. Ms. Bauman told him he was nothing more than a “sperm donor” to Logan, and that she would never allow him to see her.
 

 According to defendant, Ms. Bauman then tried to take the gun away from him. While they were struggling, he got control of the gun and, in a rage, shot her in the shoulder. Even though he did not remember it, he knew that he shot his ex-wife three more times. He also did not remember shooting himself twice in the head. As a result of his self-inflicted wounds, defendant was in a coma for a month. He has no sight in his right eye, and seizures due to brain swelling. He complains of memory loss limited to events immediately before and after the shooting.
 

 In his first assignment of error, Mr. Bauman argues that the evidence at trial was insufficient to support his conviction for second degree murder; and that the State proved only the lesser offense of manslaughter.
 
 [3]
 
 Defendant does not dispute that he shot Ms. Bauman, but he argues that the State failed to prove he had the specific intent necessary to commit second degree murder.
 
 [4]
 
 The State re
 
 *184
 
 sponds that the evidence showed that he had the requisite intent; specifically, defendant wrote a note of apology to his parents, armed himself with a loaded gun, and shot Ms. Bauman four times.
 

 | t)The constitutional standard for testing the sufficiency of the evidence, as enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.
 
 State v. Ortiz,
 
 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. This is not a separate test from the
 
 Jackson
 
 standard, but rather provides a helpful basis for determining the existence of reasonable doubt.
 
 State v. McFarland,
 
 07-26 (La.App. 5 Cir. 5/29/07), 960 So.2d 1142, 1146,
 
 writ denied,
 
 07-1463 (La.1/7/08), 973 So.2d 731. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 Id.
 

 Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm, or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A);
 
 State v. Kirkland,
 
 01-425 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 268,
 
 writ denied,
 
 01-2967 (La.10/14/02), 827 So.2d 415. In the instant case, the State proceeded under the first theory of second degree murder
 
 regarding
 
 specific intent.
 

 Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be | ^proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
 
 State v. Graham,
 
 420 So.2d 1126, 1127 (La.1982);
 
 State v. Young,
 
 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 95. Whether a defendant possessed the requisite intent in a criminal case is for the trier-of-fact, and a review of the correctness of this determination is guided by the
 
 Jackson
 
 standard.
 
 State v. Gonzalez,
 
 07-449 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8,
 
 writ denied,
 
 08-228 (La.9/19/08), 992 So.2d 949.
 

 Our review reveals that the evidence, both direct and circumstantial, was sufficient to support the conclusion that the defendant had specific intent to kill or inflict great bodily harm on his ex-wife. First, the act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier-of-fact that the defendant acted with specific intent to kill.
 
 State v. Hidalgo,
 
 95-319 (La.App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197-98. Defendant admitted that he shot his ex-wife in the shoulder while they were struggling over the gun.
 

 Second, it is reasonable to conclude that defendant intended to discharge his weapon during his confrontation with Michelle. He wrote an apology note vfith his parents’ contact information, which he left in his car, before entering Michelle’s office. When asked why he apologized to his parents before the shootings took place, defendant stated that he knew he “was com
 
 *185
 
 ing to jail eventually, you know, because of the stupid thing I did.”
 

 Defendant further argues that he shot his ex-wife in the heat of passion, out of provocation, and that he was guilty of manslaughter rather than second degree murder. According to La. R.S. 14:31(A)(1), manslaughter is a homicide that would be a first or second degree murder, but
 

 the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not Inreduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that the average person’s blood would have cooled, at the time the offense was committed.”
 

 “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense.
 
 State v. Dobbins,
 
 05-342 (La.App. 5 Cir. 12/27/05), 920 So.2d 278, 283-84.
 

 In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence.
 
 Id.
 
 Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control.
 
 State v. Deal,
 
 00-434, p. 5 (La.11/28/01), 802 So.2d 1254, 1260,
 
 cert. denied,
 
 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The question for this Court on review is whether a rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.
 
 State v. Lombard,
 
 486 So.2d 106, 111 (La.1986);
 
 State v. Lawson,
 
 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516.
 

 In this case, the jury found that defendant failed to meet his burden of proof that he acted in “sudden passion” or “heat of blood.” After our review, we find that a rational trier-of-fact could find defendant failed to establish the mitigatory factors.
 

 Defendant claimed that he shot his ex-wife because he was enraged by her refusal to allow him to see his daughter. He testified that all he was thinking was that he would not ever see his daughter again, and she was the only thing he loved in the world. But, defendant also testified that, since he and Ms. Bauman divorced in 2003, he had not tried to visit with their daughter. Thus, a reasonable trier-of-fact could find that his testimony regarding provocation was not credible.
 

 112Pefendant further stated that he was “seeing red” over the fact that Ms. Bau-man had hung up on him then referred to him as nothing more than a “sperm donor” to their daughter. Again, a reasonable trier-of-fact could conclude that this was insufficient to deprive an average person of his self-control and cool reflection.
 

 In our review, we find that the evidence at trial showed that defendant drove around on the morning of the incident, consuming copious amounts of alcohol while armed with a deadly weapon. He had the presence of mind to write a note apologizing to his parents for his actions. He then entered the victim’s workplace, armed with a loaded gun, and purposely fired it at her. Considering the circumstances, defendant’s actions, and the extent of Ms. Bauman’s injuries, the evidence was sufficient under
 
 Jackson
 
 to support the jury’s finding that defendant had specific intent to kill or inflict great bodily harm on Ms. Bauman and was, thus, guilty of second degree murder.
 

 
 *186
 
 In his next assignment of error, defendant argues that the handwritten note seized from his car at the scene should have been suppressed because it was the product of an illegal warrantless search. The State contends that the seizure fell under a number of exceptions to the warrant requirement.
 

 Detective Morales testified, at the pretrial suppression hearing, that when he arrived at the scene, he saw a four-door, blue Buick Century with a Missouri license plate parked oddly in the parking lot. He learned, through a computer search, that the car was registered to Danny Bauman, the victim’s ex-father-in-law, who lived in Missouri. Witnesses at the scene informed Detective Morales that a man exited that car with a pistol and ran into the IDD office, where the victim was gunned down.
 

 1 ^Detective Morales testified that he had other officers secure the car until he had an opportunity to examine it. When he approached the vehicle, he noted that the two front windows were completely open. Standing next to the car, he looked in through the passenger side window. He saw, on the front passenger seat, a handwritten note on a notepad. From his vantage point, he had an unobstructed view of the note, which he was able to read.
 
 [5]
 
 The note read, “ ‘Judy and Danny Bauman, 417-239-1154. Call and tell them I love them and I’m sorry. Josh.’ ”
 

 Detective Morales immediately believed that the note was pertinent to the investigation and instructed crime lab personnel to collect it. The detective explained that, although he would usually have a vehicle towed from a scene to the detective bureau before having it processed for evidence, he did not follow that procedure in this case because he was concerned that the note would be destroyed or lost in transit. To preserve the evidence properly, the car had to be processed in the same state that it was found, with the front windows open.
 

 Detective Morales testified that the car was ultimately towed from the scene. He obtained a search warrant on September 10, 2004, but no evidence was seized from the car when the vehicle was searched pursuant to the warrant.
 

 At the conclusion of the suppression hearing, the trial judge found that the seizure of the note was valid because it was based on exigent circumstances. The judge further commented it was readily apparent from a reading of the note that it was important to the investigation.
 

 A warrantless search is
 
 per se
 
 unreasonable unless justified by one of the narrowly drawn exceptions to the Fourth Amendment’s warrant requirement.
 
 Schneckloth v. Bustamante,
 
 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). If evidence is derived from an unreasonable search or seizure, the 114proper remedy is to exclude the evidence from trial.
 
 State v. Boss,
 
 04-457 (La.App. 5 Cm. 10/26/04), 887 So.2d 581, 585. In a hearing on a motion to suppress, the State bears the burden of proving that such an exception applies. La.C.Cr.P. art. 703 D;
 
 State v. Addison,
 
 05-378 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 890,
 
 writ denied,
 
 06-1087 (La.11/9/06), 941 So.2d 36. Trial courts are vested with great discretion in ruling on a motion to suppress and, consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion.
 
 State v. Long,
 
 03-2592 (La.9/9/04), 884 So.2d 1176, 1179,
 
 cert. denied,
 
 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005).
 

 
 *187
 
 In this case, the State contends that the evidence was validly seized pursuant to, among others, the “plain view” exception. The “plain view” doctrine is a recognized exception to the warrant requirement.
 
 Coolidge v. New Hampshire,
 
 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971);
 
 State v. Smith,
 
 07-815 (La.App. 5 Cir. 3/11/08), 982 So.2d 821, 825,
 
 writ denied,
 
 08-0927 (La.11/14/08), 996 So.2d 1088. Police may seize evidence under the “plain view” doctrine when: 1) there is prior justification for an intrusion into the protected area and 2) it is immediately apparent, without close inspection, that the items seized are evidence or contraband.
 
 Horton v. California,
 
 496 U.S. 128, 135-136, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990). In the instant case, Detective Morales was rightfully in the area of defendant’s vehicle, which was parked in a public parking lot.
 

 Defendant argues it was not immediately apparent that the note was evidence of a crime. The record, including photographic evidence, reveals that Detective Morales could easily read the note on the seat of the car through the car’s open window. The detective had a witness who stated that the driver of the Buick Century exited the vehicle carrying a gun and ran into the office where the | ^shootings took place. Based on his forty years of experience as a homicide investigator, he stated that he believed the note constituted evidence relevant to the shootings. We agree.
 

 The “plain view” exception does not require a police officer to be certain that the object in plain view is contraband; it simply requires that the officer have probable cause to believe that the item in question is either evidence and/or contraband.
 
 Texas v. Brown,
 
 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983);
 
 State v. Smith,
 
 07-815 at 6, 982 So.2d at 825. In this case, the note was evidence relevant to the crime in question. Based on the foregoing, we cannot say that the trial court abused its discretion in denying defendant’s motion to suppress the evidence.
 

 Finally, as is our customary practice, we have reviewed the record for errors patent. La C.Cr.P. art. 920. We note that neither the transcript nor the commitment/minute entry indicates that the jury was sworn as required by La. C.Cr.P. arts. 788 and 790. Jury irregularities were not, however, raised in the trial court or on appeal. Consideration of that issue is, therefore, waived. More importantly, we find no prejudicial error.
 
 State v. Wilkinson,
 
 00-339 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 771. No corrective action is required.
 

 In conclusion, we find no merit in defendant’s arguments on appeal. Defendant’s sentence and conviction are hereby affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Ms. McKnight knew Josh Bauman when he was married to Ms. Bauman.
 

 [2]
 

 . Deputy Billy Lewis of the Jefferson Parish Sheriff's Office Communications Division testified that he is the custodian of records for emergency communications. His department received five 9-1-1 calls regarding this case. A recording of those 9-1-1 calls was played lor the jury.
 

 [3]
 

 . When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.
 
 Id.
 
 Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial.
 
 Id.
 
 Therefore, we will address the sufficiency of the evidence as his first assignment of error.
 

 [4]
 

 . Prior to trial, defendant filed notice of defense based on mental condition under La. C.Cr.P. art. 726, stating his intention to introduce testimony relating to a "mental disease, defect or other condition, including but not limited to intoxication, drugged and/or other mental condilion(s) from which the defendant was suffering at the time of the offense bearing upon the issue of whether he/she had the mental state required for the offense charged.” The records reflects that, aside from his own testimony that he had a "buzz" after consuming a case and a half of beer on the morning of the shooting, defendant did not offer any evidence regarding a mental condition or defect from which he suffered at the time of the offense.
 

 [5]
 

 . At trial, Detective Morales identified photographs, which were introduced into evidence at the trial, depicting the car and the note's position inside the car.