EDWARD A. DUFRESNE, JR., Chief Judge.
 

 |2In January of 2008, a Jefferson Parish Grand Jury returned an indictment charging defendant, Rony 0. Arias-Chavarria, with second degree murder in violation of LSA-R.S. 14:30.1. At the arraignment, defendant pled not guilty.
 
 [1]
 
 Defendant then filed motions to suppress evidence, identification, and confession, which were heard and denied by the trial judge on August 6, 2008.
 

 On August 18 and 19, 2009, the matter proceeded to trial before a twelve person jury. After considering the evidence presented, the jury found defendant guilty as charged. On August 25, 2009, the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant now appeals.
 

 FACTS
 

 On the morning of September 10, 2007, Thomas Dimm, an excavating contractor, was clearing out trash and weeds from an overgrown vacant lot in the 2400 block of Helena Street in Kenner, Louisiana. While cutting the grass, he | (¡discovered the partially nude body of a white woman in the lot. Upon seeing this, Mr. Dimm immediately called the police.
 

 Detective Herbert Hille of the Kenner Police Department, Criminal Investigations Division, responded to the scene. Upon his arrival, Detective Hille observed the deceased female lying in the uncut grass approximately forty feet from the doors of the back side of the businesses adjacent to the vacant lot, nearest to doors that opened into an auto body shop called Medina’s One Stop. The victim was subsequently identified as twenty-one year old Bobbie Jo Hulsey.
 

 During the course of his investigation, Detective Hille discovered that the victim had last been seen entering Medina’s One Stop during the early morning hours of September 10, 2007. As a result of this information, Detective Hille prepared a search warrant for Medina’s One Stop,
 
 *429
 
 which was executed on September 12, 2007. During their search of the business, officers found defendant in the restroom and detained him while the search was being conducted. Defendant, who had been employed at Medina’s for approximately two weeks, identified himself as “Jose Luis Flores Castillo” and advised the officers that he was temporarily living at the business.
 

 On a table in the office, the officers located a piece of paper with the victim’s name and cell phone number on it. The information was written on stationary from the Studio Lodge, the hotel where the victim had been living prior to her death. The officers also found the victim’s cell phone and cell phone charger in defendant’s backpack, which was discovered behind a couch in the office.
 

 Subsequent to the search, the officers interviewed defendant at the Criminal Investigations Division. In this initial interview, defendant claimed that he had met the -victim outside a convenience store the day before her body was discovered |4and that she had given defendant her cell phone number and told him he could call her for sex. Defendant stated that he called the victim later that night, that she went to Medina’s One Stop, that they had sex, and that she left, leaving her cell phone behind.
 

 After further investigation, the officers interviewed defendant again on September 13, 2007, at which point he provided the officers with his real name, Rony Omar Arias-Chavarria, and agreed to give a statement. During this second interview, defendant admitted that he took the victim to Medina’s and that he paid her to have sex with him. Defendant claimed that when they began to have sex, the victim laughed at him and told him that his penis was small. Defendant became angry, removed his penis, and inserted four fingers into the victim’s vagina. The victim told him to stop, and when defendant removed his fingers, they were covered in blood. Defendant contends that he continued to have sex with the victim, but the victim kept laughing. Defendant put his arm around the victim’s neck, squeezing until she fell to the ground. Defendant carried the victim to the field behind the shop and left her body lying in the grass. Defendant cleaned the blood from the floor with cleaning solution from the office. Defendant admitted that he did not try to call for help after the victim fell to the ground, but later called a man named Benito about an unrelated matter. After the interview was concluded, defendant was arrested for second degree murder.
 

 In order to corroborate defendant’s statement, Detective Hille secured the phone records for both the victim’s cell phone and the business phone at Medina’s One Stop. The phone records from Medina’s One Stop confirmed that a call was placed from Medina’s to the victim’s cell phone at 1:35 a.m. on September 10, 2007. The records further reflected that there was a call placed from the victim’s | f,phone to a prepaid account in the name of Benito Hernandez at 5:25 a.m. on that same date.
 

 At trial, Mr. Medina confirmed that defendant worked at Medina’s One Stop and that he was living in the office when the victim’s body was discovered in the vacant lot. Mr. Medina testified that defendant had a key to Medina’s and that he was the only person living at the shop. When Mr. Medina arrived at the shop the day after the victim was discovered, he observed that the shop was clean and neat, and that the office smelled of Clorox cleaning solution.
 

 An autopsy performed by Dr. Karen Ross, a forensic pathologist and Assistant Coroner at the Jefferson Parish Coroner’s Office, established the cause of the victim’s
 
 *430
 
 death as strangulation associated with blunt force injuries. During her examination, Dr. Ross also observed “gaping lacerations of the vaginal and perianal area” and a “perforation between the vagina and the anus” that extended for six inches from the vagina. Dr. Ross opined that the injuries to both the neck and the vaginal/anal areas contributed to the victim’s cause of death.
 

 In an effort to obtain a possible match from DNA evidence collected from the victim, Detective Hille obtained and executed a search warrant to take a saliva sample from defendant using a buccal swab. Bonnie Dubourg, a forensic DNA analyst for the Jefferson Parish Sheriffs Office, tested the samples taken from both the victim and defendant, and concluded that defendant could not be excluded as a possible DNA donor. Based on a statistical analysis performed on the source profile, Ms. Dubourg testified that the odds of someone other than defendant having that profile would be greater than one in one hundred billion, with the exception of identical twins.
 

 |
 
 SUFFICIENCY OF THE EVIDENCE
 

 On appeal, defendant challenges the sufficiency of the evidence used to convict him of second degree murder. Specifically, he contends that the evidence proved that the killing was committed in the heat of passion and, as such, constituted manslaughter. Defendant requests that this Court set aside the verdict rendered by the jury and enter a verdict for the responsive charge of manslaughter.
 

 In reviewing the sufficiency of the evidence pursuant to the standard set forth in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), an appellate court must determine whether the evidence, either direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.
 
 State v. Ortiz,
 
 96-1609 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998);
 
 State v. Lawson,
 
 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522.
 

 In the present case, defendant was convicted of second degree murder in violation of LSA-R.S. 14:30.1. To support a conviction for second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1 A(1);
 
 State v. Bauman,
 
 08-1169 (La.App. 5 Cir. 5/12/09), 15 So.3d 177, 184,
 
 writ denied,
 
 09-1533 (La.5/23/10), 34 So.3d 300.
 

 Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact. Specific intent may be inferred from the circumstances surrounding the offense and from the 17defendant’s action, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries.
 
 State v. Lawson,
 
 1 So.3d at 522.
 

 Our review reveals that the evidence, both direct and circumstantial, was sufficient to support the conclusion that defendant had the specific intent to kill or inflict great bodily harm on the victim. In the instant case, the events described in defendant’s confession were corroborated by the autopsy report and DNA testing results, phone records, and the testimony of Dr. Ross, Detective Hille, and Ivan Medina. Specifically, the evidence presented at trial
 
 *431
 
 showed that defendant worked at Medina’s One Stop and was living in the office at Medina’s when the victim’s body was discovered in the vacant lot nearby. The body was discovered approximately forty feet from the doors that opened into Medina’s One Stop.
 

 Additionally, defendant admitted that he took the victim to Medina’s and that he paid her to have sex with him. Defendant stated that he became angry when the victim laughed at the size of his penis, that he inserted four fingers into the victim’s vagina, and that when he removed his fingers, they were covered in blood. When the victim continued to laugh at defendant, he put his arm around the victim’s neck, squeezing until she fell to the ground. After he realized the victim was dead, defendant admitted that “[t]he first idea is, I throw her away some place,” and he carried the victim to the field behind the shop and left her body lying in the grass. Finally, defendant admitted to cleaning the blood from the office floor, but did not call anyone or attempt to get help for the victim.
 

 The phone records offered at trial corroborate the information contained in defendant’s statement regarding defendant’s meeting with the victim. The records from Medina’s One Stop confirmed that a call was placed from Medina’s to the victim’s cell phone at 1:35 a.m. on September 10, 2007.
 

 IsThe testimony offered by Dr. Ross established that the cause of the victim’s death was strangulation associated with blunt force injuries, which is consistent with defendant’s statement. In Dr. Ross’ opinion, the injuries sustained to the victim’s vaginal and perianal area could have been caused by the insertion of four fingers into that area, and the injuries to the victim’s neck could have been caused by defendant using his arm to strangle the victim. Finally, the severity of the injuries sustained by the victim was highlighted by testimony of Dr. Ross, who stated that the victim had “really gaping lacerations of the vaginal and perianal area,” and that “there was a perforation between the vagina and the anus” that “extended for six inches from the vagina.” Finally, the evidence offered by the forensic DNA analyst showed not only that defendant could not be excluded as a possible DNA donor, but that the odds of someone other than defendant having that profile would be greater than one in one hundred billion, with the exception of identical twins.
 

 Based on the foregoing, we conclude that the evidence presented at trial was constitutionally sufficient to support the jury’s finding that defendant had the specific intent to kill or inflict great bodily harm on the victim. Despite our finding that the evidence was sufficient to establish second degree murder, we will nonetheless address defendant’s argument that the evidence at trial proved at most that he was guilty of manslaughter because the killing was committed in the heat of passion.
 

 LSA-R.S. 14:31 A(l) defines manslaughter as a homicide which would be first or second degree murder, “but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually 19cooled, or that an average person’s blood would have cooled, at the time the offense was committed.”
 

 “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. In order to be entitled to the
 
 *432
 
 lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.
 
 State v. Bauman,
 
 15 So.3d at 185;
 
 State v. Lawson,
 
 1 So.3d at 523.
 

 The evidence presented at trial does not support defendant’s claim that he killed the victim in “sudden passion” or “heat of blood.” By defendant’s own admission, the victim’s only provocation was that she laughed at him while they were having sex and told him that he had a small penis. Defendant also admitted that he became angry and “lost control” when the victim insulted him. It has been held that mere words or gestures, however offensive or insulting, will not reduce a homicide from murder to manslaughter.
 
 State v. Mitchell,
 
 39,202 (La.App.2d Cir.12/15/04), 889 So.2d 1257, 1263,
 
 writ denied,
 
 05-0132 (La.4/29/05), 901 So.2d 1063.
 

 Considering the circumstances, defendant’s actions, and the extent of the victim’s injuries, we find that the evidence was sufficient under
 
 Jackson
 
 to support the jury’s finding that defendant had specific intent to kill or inflict great bodily harm on the victim and was, thus, guilty of second degree murder. Accordingly, the arguments raised by defendant in this assigned error are without merit.
 

 \mDENIAL OF MOTION TO SUPPRESS STATEMENT
 

 In this assigned error, defendant argues that the trial court erred in denying his motion to suppress statement because the State failed to prove that his waiver of rights and subsequent confession were knowing and intelligent, considering defendant’s inability to communicate fluently in English. Specifically, in his appellate brief, defendant contends that “the overall circumstances of the taking of the statement, with the obvious language barrier, the ad hoc provision of a translator for the waiver of critical constitutional rights, and the failure even to translate as much as 70 of appellant’s recorded responses, shows that the state failed to carry its heavy burden of proving a knowing and intelligent waiver of rights.” As such, defendant argues that his confession should have been suppressed.
 

 Detective Herbert Hille, who investigated the murder of Bobbie Jo Hulsey, and Officer Ninoska Guggenheim, who read defendant his rights in Spanish and assisted with translation during defendant’s interview, testified at the suppression hearing. With regard to her translating ability, Officer Guggenheim testified that she has an Hispanic background, that her parents are from Honduras, that defendant advised her that he was from Honduras, and that she spoke Spanish in her household as child. Officer Guggenheim took Spanish classes in high school and a semester of Spanish in college, and has participated in translating over one hundred cases during her time with the Kenner Police Department. However, Officer Guggenheim has never been qualified as an expert in translation, and she does not have a language degree.
 

 At the suppression hearing, the officers testified that defendant was initially interviewed on September 12, 2007, and agreed to give a statement. Although the officers were able to converse with defendant in English, and though both officers |nnoted that defendant could understand their con
 
 *433
 
 versations in English, Officer Guggenheim was called to assist with the interview. Prior to the interview, Officer Guggenheim read defendant his rights in both English and Spanish, and defendant signed the rights of arrestee form and acknowledged that he understood his rights. Both officers testified that they did not force, threaten, coerce, intimidate, or make any promises or inducements to defendant to get him to give a statement. Additionally, Officer Guggenheim testified that defendant was advised that if he did not understand what was being asked, they would translate the questions for him.
 

 The officers interviewed defendant again on September 13, 2007, at which point defendant provided the officers with his real name and agreed to give a statement. Officer Guggenheim read defendant his rights again, in both English and Spanish, and defendant signed another advice of rights form in his own name. Defendant acknowledged that he understood his rights and wished to waive them. Both officers testified that they did not force, threaten, coerce, or intimidate defendant, nor did they make any promises or inducements to defendant in order to obtain his statement.
 
 [2]
 

 After considering the evidence presented at the hearing, the trial court denied defendant’s motion to suppress, holding that the statements were constitutionally obtained. Defendant now challenges this ruling.
 

 The State has the burden of proving the admissibility of a purported confession or statement by the defendant. LSA-C.Cr.P. art. 703(D). Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was l^first advised of his
 
 Miranda?
 
 rights, that he voluntarily and intelligently waived his
 
 Miranda
 

 [3]
 

 rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.
 
 State v. Franklin,
 
 03-287 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70,
 
 writ denied,
 
 03-3062 (La.3/12/04), 869 So.2d 817;
 
 see also
 
 LSA-R.S. 15:451.
 

 A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. The admissibility of a confession or statement is a determination for the trial judge and the judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 State v. Franklin,
 
 858 So.2d at 70.
 

 Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given.
 
 State v. Mackens,
 
 35,350 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, 463,
 
 writ denied,
 
 02-0413 (La.1/24/03), 836 So.2d 37. In the present case, defendant was advised of his
 
 Miranda
 
 rights, including the right to remain silent, on two separate occasions, in both English and Spanish. Defendant signed waiver of rights forms, in both English and Spanish, prior to both interviews. On both forms, defendant indicated that, though he did not have the ability to read or to write English, he understood the rights that had been read to him, was willing to answer questions without a lawyer, and waived his right to remain silent. Defendant further
 
 *434
 
 indicated that he had not been threatened or induced to waive his rights. In addition, the officers testified that they did not threaten, force, or coerce defendant into giving a statement.
 

 Given these circumstances, we find that defendant’s statements were freely and voluntarily made after a knowing and intelligent waiver of his constitutional 11 .-¡rights. Accordingly, the trial court did not abuse its discretion in denying defendant’s motion to suppress statements. This assigned error is without merit.
 

 ERROR PATENT DISCUSSION
 

 We have also reviewed the record for errors patent in accordance with LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975). Our review reveals that the trial court failed to advise defendant of the time period within which to apply for post-conviction relief, as required by LSA-C.Cr.P. art. 930.8. In accordance with the procedure employed in
 
 State v. Neely,
 
 08-707 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538,
 
 writ denied,
 
 09-0248 (La.10/30/09), 21 So.3d 272, and
 
 State v. Davenport,
 
 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451,
 
 writ denied,
 
 09-0158 (La.10/16/09), 19 So.3d 473, we advise defendant by this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922.
 

 Accordingly, for the reasons set forth herein, we affirm defendant’s conviction and sentence.
 

 DEFENDANT’S CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . Defendant was provided with a Spanish language interpreter at every substantive court appearance, including the arraignment, the motion to suppress hearing, the trial, and the sentencing proceedings.
 

 [2]
 

 . Ms. Trigueros, the Spanish speaking crime scene technician, also assisted with translation during this interview.
 

 [3]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)