*30
 
 FREDERICKS HOMBERG WICKER, Judge.
 

 | gin this criminal matter, Stephen Hayes, Jr., defendant/appellant, appeals his second degree murder jury trial conviction and his life sentence at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, Mr. Hayes raises two assignments: (1) The trial court erred in denying his motion for mistrial when a state witness/detective mentioned that the defendant had a couple of arrests. (2) There is insufficient evidence to support the conviction. For the reasons that follow, we affirm.
 

 Facts
 

 On November 7, 2005 at 11:00 PM, Shanikra Striggs died as a result of a single gunshot wound to the head. Five hours later, Mr. Hayes gave a statement to the police and revealed the gun’s location. Detective Juliet Zeringue testified that the bullet taken out of Ms. Striggs’s head matched the gun and the casing that they found at the scene. Mr. Hayes was arrested and subsequently charged by indictment with second degree murder, La.R.S. 14:30.1. Mr. Hayes, who admitted Rhe was present when the gun was fired, maintained that the shooting was accidental and unintentional.
 

 At the time, Ms. Striggs, who was also known as “Neeky,” and Mr. Hayes, who was also known as “Beware,” had resided in the home of Ms. Striggs’s mother, Joyce Harris, for nine months. Ms. Striggs, however, recently broke up amicably with Mr. Hayes and he was expected to leave by the end of November.
 

 On the night of the shooting, Ms. Harris, Ms. Striggs, and Mr. Hayes were in the home shortly before the shooting occurred. According to Ms. Harris, she never saw the couple argue that night. She also never saw Mr. Hayes strike her daughter. There were, however, reports of jealousy on Mr. Hayes’s part, which Mr. Hayes disputed.
 

 Mr. Hayes also disputed Brian Larva-dain’s testimony that two to four weeks before the shooting, Mr. Hayes spoke of killing Ms. Striggs. Mr. Larvadain, Mr. Hayes’s long-time friend, testified that Mr. Hayes told him that he and Ms. Striggs had been fighting. Mr. Hayes joked about killing Ms. Striggs. Mr. Larvadain explained that Mr. Hayes said that he “got a mind to kill his old lady” and he was “gonna kill his old lady.” After Mr. Hayes told him about killing his girlfriend, Mr. Larvadain told Mr. Hayes “you know you clowning.” And, Mr. Hayes started laughing. Mr. Larvadain thought Mr. Hayes was joking although Mr. Larvadain was concerned about that statement. Mr. Lar-vadain told the police that he did not take the comment seriously because they were clowning around and joking.
 
 [1]
 

 Thereafter, on the night of the shooting, two witnesses heard the events that occurred immediately before the incident— Ms. Harris and Michael Williams (also known as Michael Benberry, “Black,” and Niafeece Jamaal Bey).
 

 ^According to Ms. Harris, she heard the gunshot, ran outside, and saw her daughter slumped in the driver’s seat of her vehicle with her legs outside the vehicle. She saw Mr. Hayes run quickly from the scene without asking her to call an ambulance. Although Mr. Hayes admitted that he panicked and left the scene, he stated that he immediately attempted to get help from an aunt who lived nearby. He said
 
 *31
 
 that the aunt, however, did not respond to his knocking at the door. Also, he denied running. Mr. Hayes testified that he could not run because of an injury. He explained that his actions evidenced no intent to kill and run away because he did not bring money, identification, or a phone with him when he went outside.
 

 According to Mr. Williams — who unlike Mr. Hayes had previous convictions — Mr. Williams spoke to Ms. Striggs several times on the telephone that night and immediately before the shooting. Detective Juliet Zeringue testified that telephone records verified those calls. She said that the last call from the Striggs’s number to Mr. Williams was a four minute call at 9:58 PM, only six or seven minutes before the police were dispatched.
 

 The pertinent events leading up to the final call began after Ms. Striggs returned home from her work as a security guard. After her return, Ms. Striggs and Mr. Hayes amicably went for a walk in a local park.
 

 According to Ms. Harris, upon their return, Ms. Striggs took the cordless house phone in the bathroom with her. Mr. Hayes asked to use the telephone and she allowed him to use it momentarily.
 

 Different versions of that evening’s telephone conversations and their effect on Mr. Hayes were presented at trial.
 

 Mr. Williams, who lived out of town with his fiancée, testified that he and Ms. Striggs were friends who regularly spoke on the telephone. That night, Ms. Striggs called him around 7:00 PM and they spoke for about an hour. Twenty | Sminutes later, she called again and they spoke for another hour or so. Two minutes later, she called again. At that point Mr. Hayes wanted to speak to Ms. Striggs. Mr. Williams agreed to end the conversation. He heard Mr. Hayes say: “Get off the f- - - phone. You on the phone with him again?” Two minutes after ending the conversation, Ms. Striggs called Mr. Williams and told him that she would continue the conversation in her car.
 

 In contrast, Mr. Hayes testified there was no animosity between himself and Ms. Striggs that evening. He admitted that he asked to use the telephone when Ms. Striggs was in the bathroom but he denied knowing that she was actually using the phone, being upset, asking who was on the phone with her, and asking Ms. Striggs to get off the phone. After he used the phone, he returned it to her. Mr. Hayes testified that he did not know Mr. Williams. He stated that Mr. Williams lied when he said he heard Mr. Hayes tell the Ms. Striggs to get off the f— phone.
 

 Ms. Harris and Mr. Hayes presented somewhat different accounts of the events that transpired after the bathroom exchange.
 

 Ms. Harris testified that upon completing her bath, Ms. Striggs approached Mr. Hayes, spoke to him, and then went outside with the telephone. Ms. Striggs told her mother that she was going to her car. Ms. Harris was under the impression that her daughter wanted to have a private conversation. Ms. Harris stated that she then observed Mr. Hayes briefly walk outside and reenter. She testified that Mr. Hayes did not appear upset at the time. Next, Mr. Hayes went outside at which time Ms. Hayes heard her daughter yell the defendant’s nickname, “Beware.” Then Ms. Harris heard a gunshot. At this point, Ms. Harris ran to the door and saw Mr. Hayes leave the scene.
 

 Mr. Hayes denied that Ms. Striggs screamed his name. However, Mr. Williams, like Ms. Harris, also testified that he heard Ms. Striggs scream “Beware” Rbefore the phone went dead. According to Mr. Williams, he heard the car
 
 *32
 
 door open and close, making a familiar dinging sound. Then, he could hear the dinging sound when the door opened once more. Approximately three minutes after he first heard the sound, he heard Ms. Striggs scream: “No, Beware, no, no, no, no, no.” Then, the phone went dead.
 

 At trial as well as in his statement to the police (after receiving
 
 Miranda
 
 warnings and waiving his
 
 Miranda
 
 rights),
 
 [2]
 
 Mr. Hayes stated that he went outside to place a gun in the car’s glove compartment out of concern for the safety of children who had recently been playing in the gun’s vicinity. The gun belonged to Ms. Harris’s husband. According to Ms. Harris, approximately three months before the incident, she asked Mr. Hayes to place the gun — which at that time was in a drawer— in a safe place. She stated that the gun and the clip were separated and the gun was not loaded. Mr. Hayes, however, testified that the gun was together, not separated. Ms. Harris stated that Mr. Hayes told her that he placed the gun in a closet. She never suggested to him that it would be safer to keep the gun in the car rather than in the residence.
 

 Moreover, Ms. Harris testified that at no point did Mr. Hayes tell her that he was going outside to put the gun in the car. She testified that she did not see the gun that night. Mr. Hayes admitted that he walked past Ms. Harris with the gun under his shirt. He denied hiding the gun; he merely wanted to keep the gun out of sight of a youngster in the household.
 

 Mr. Hayes also testified that Ms. Striggs told him to place the gun in storage. So, he intended to place it in the glove compartment and from there place it in a storage facility.
 

 [ ./According to Mr. Hayes, when attempting to place it in the glove compartment, he went to the driver’s side because there was oil on the ground on the passenger’s side and he had showered and worn slippers. He did not know that Ms. Striggs was in the car until he found it locked and knocked on the door. Also, he could not see her at first because of the tinted windows and the fact that it was dark outside. He expected the car door to be unlocked because he left it that way after they returned from the park.
 

 Additionally, in his statement and at trial, Mr. Hayes stated that both the gun’s safety and clip did not work well — the clip was always slipping out. Furthermore, in his statement, he recounted that he thought there were two or three bullets in the gun although the gun was never fully loaded. At trial, however, he testified that he did not know whether there was a bullet in the chamber because he never checked the gun. In his statement, Mr. Hayes agreed with Detective Zeringue that for safety reasons, he should have unloaded the gun and separated the clip from the gun.
 

 According to Mr. Hayes the gun accidentally discharged. He explained that Ms. Striggs, who was sitting in the locked car while on the telephone, “freaked out,” and grabbed the barrel when she saw the gun. When he initially pulled the gun out to tell his girlfriend to place it in the glove compartment, she “banged” him and “it ejected.” The gun went off. He did not know whether Ms. Striggs’s hand hit the trigger when she banged him. He explained that Ms. Striggs was a large woman, who weighed 250 to 260 pounds in comparison to Mr. Hayes, who weighed only 160 pounds. At trial, he stated that because of the degree of force Ms. Striggs exerted, his arm hit the inside of the door panel, injuring his right arm.
 

 
 *33
 
 Detective Zeringue testified that the keys were in the ignition when she arrived at the scene. She stated that she had two different accounts as to whether |sthe door was locked before the shooting. On one hand, Mr. Hayes said that the door was locked. According to Mr. Williams, however, the door was not locked; Mr. Williams told the detective that he heard Ms. Striggs open the car door and he heard the dinging sound. Detective Ze-ringue recounted her experience with cars and testified that the key must be in the ignition in order for the dinging sound to occur, thus appearing to dispute Mr. Hayes’s testimony that when he encountered Ms. Striggs, the car’s door was locked. But, Detective Zeringue acknowledged that Mr. Williams was not an eyewitness and therefore would not be in a position to see whether or not the key was in the ignition at the time that he heard the sound.
 

 Shortly after the shooting, police officers searched the nearby area for Mr. Hayes. Then about five hours later, Mr. Hayes, who was shoeless, approached a patrolling police unit as he lifted his shirt. Mr. Hayes explained that he raised his shirt in order to show the police that he had nothing on him. Mr. Hayes cooperated with the officers and after being advised of his
 
 Miranda
 
 rights, informed them that he had hidden the gun under a shed where he had been hiding. After taking Mr. Hayes to the unit, the officers took the precaution of moving to a safer location given that Mr. Hayes was near the scene and the victim’s family was nearby.
 

 According to Mr. Hayes, the nearby presence along with a voiced threat to kill him, prompted him to hide. In addition, he did not want to confront Ms. Striggs’s mother.
 

 In addition to testimony regarding the shooting, the state presented forensic evidence. That evidence established that Ms. Striggs died as a result of a single close contact gunshot wound to the head. And, Ms. Striggs had no defensive injuries although she had a broken fingernail.
 

 | ^According to Dr. James C. Traylor, the expert in forensic pathology who provided the autopsy report, the gun was one inch or closer to the wound. He stated that if the victim had grabbed the gun while it discharged, he would have expected to see soot or possibly blood on her hand, which he did not see. But, he acknowledged that soot could be present but undetected by him. He also agreed with defense counsel that the gun was close enough to her body that Ms. Striggs could have touched it with her hand.
 

 Defense counsel pursued a line of questioning regarding whether the shooting was an accident. At one point, Dr. Traylor said: “What the h — is a muzzle end of the weapon doing next to somebody’s head that’s an accident?” Dr. Traylor testified that based on his experience with over 3,000 autopsies — with the vast majority being gunshot wounds — Dr. Traylor had never seen a gun accidently discharged in that manner. Dr. Traylor, however, stated that although he did not think it was possible, he was not testifying that it was not possible that an accident occurred.
 

 Jim Churchman, an expert in forensic science, testified that he actually fired the gun three times in the laboratory. He explained that the weapon was functional although it had a missing spring that could cause the magazine to slip out. Mr. Churchman stated that someone would sustain an injury, such as a hole or abrasion, from contact with the slide, if at the time the gun was fired the person had a hand wrapped around the barrel. The injury would occur when the violent pull on the slide snagged a hand as the cartridge case ejected.
 

 
 *34
 
 Detective Zeringue agreed that the gun had a slide. She explained that if someone grabbed the barrel of the gun it would do one of two things. Either the gun would not fire because the person would be able to hold the slide on the gun, or if the casing ejected, it would cut the hand due to gun’s force. The only thing 110that she noted on the victim’s hands was a broken nail. There was no cut on the inside of her hand.
 

 Mr. Churchman also testified to a weakness in this type weapon; it could accidentally discharge if dropped on a hard surface. But, in his opinion, the impact of the gun being brushed or banged while it was in someone’s hand was not the type of force that he would expect to cause an accidental discharge. He explained that in order for a semi-automatic single-action weapon like this one to fire, the trigger pull required pressure in the range of five to seven pounds.
 

 In addition to evidence regarding the gun, the state presented DNA evidence. Jasmine Thomas, an expert in forensic DNA analysis, examined DNA profiles from swabs taken from the gun (the handle, trigger
 
 [3]
 
 and barrel), the door handle, Ms. Striggs, and Mr. Hayes. She testified that she did not get any DNA on the trigger. The DNA profiles on the barrel and the handle of the gun were consistent with the DNA profile obtained from Mr. Hayes. There was no DNA on the gun (including the barrel) from the victim. Ms. Thomas testified that she would have expected to see the victim’s DNA if it were present. She stated, however, that the absence of the victim’s DNA could possibly be explained by two factors: (1) the gun was handled by different people and the machine might pick up only the more dominant person; or (2) the victim might not have left enough DNA there.
 

 Furthermore, gunshot residue tests were performed. Detective Zeringue performed gunshot residue tests of Mr. Hayes’s hands. On his right hand, the test came back positive. She only tested Ms. Striggs’s right hand because the family told her that the victim was right-handed. The results were negative. She stated it was a mistake on her part that she did not have another instant shooter kit to do the |nleft hand. Therefore, she could not determine how close the victim’s left hand was to the gun when it went off.
 

 According to Mr. Hayes, Ms. Striggs had contact with the gun. She grabbed the gun barrel, and swung at him, causing his arm that held the gun to hit the inside of the doorframe. He testified that as a result, his wrist was swollen. He stated that when he arrived at the police station, Deputy Percy Louque gave him Ziploc ice packs for a swollen wrist.
 

 Deputy Percy Louque testified that after Mr. Hayes was in the St. James Parish Jail a couple of days, he gave Mr. Hayes ice to put on his hand. He stated that Mr. Hayes appeared to be sincere when he said that his hand was hurting.
 

 In contrast to Deputy Louque, who did not see Mr. Hayes when he first arrived at the jail, three officers who saw Mr. Hayes shortly after the shooting testified that Mr. Hayes did not complain of an injury.
 

 One of those officers, Detective Ze-ringue, testified that she interviewed Mr. Hayes about eight hours before he was booked. Although she never asked Mr. Hayes if he was injured, Mr. Hayes did not appear to be in any type of physical
 
 *35
 
 distress and he did not complain. Moreover, Mr. Hayes showed no signs of injury when she examined his wrist and the back of his hand while performing the gunshot residue test on Mr. Hayes’s hands. If Mr. Hayes had asked for ice, she would have noted that and immediately informed the jailer.
 

 After weighing the evidence presented, the jury found Mr. Hayes guilty as charged.
 

 Sufficiency
 

 On appeal, Mr. Hayes challenges the sufficiency of the evidence used to convict him of second degree murder. More specifically, he contends that the evidence presented at trial failed to demonstrate that he had the specific intent to 112harm Ms. Striggs. He asserts that his actions amounted to no more than a tragic accident or negligent homicide — a case of good intentions but poor judgment.
 

 In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the
 
 Jackson v.
 
 Virginia
 
 [4]
 
 standard enunciated by the United States Supreme Court.
 
 State v. Captville,
 
 448 So.2d 676, 678 (La. 1984). Where circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that: “Assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This is not a purely separate test from the
 
 Jackson
 
 standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under
 
 Jackson
 
 to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.
 
 State v. Porretto,
 
 468 So.2d 1142, 1146 (La.1985) citing
 
 State v. Wright,
 
 445 So.2d 1198 (La.1984). The trier of fact makes credibility determinations and may accept or reject the testimony of any witness.
 
 State v. Kestle,
 
 07-1573, p. 5 (La.12/2/08), 996 So.2d 275, 278 (citation omitted).
 

 Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm, or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies even though he has no intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(A);
 
 State v. Bauman,
 
 08-1169, p. 9 (La.App. 5 Cir. 5/12/09), 15 So.3d 177, 184,
 
 unit denied,
 
 09-1533 (La.5/23/10), 34 So.3d 300. In the instant case, the state proceeded under the first theory of second degree murder: specific intent.
 

 11sSpecific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La.R.S. 14:10(1). The determination of specific criminal intent is a question of fact. Specific intent may be inferred from the circumstances surrounding the offense and from the defendant’s action, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries.
 
 State v. Lawson,
 
 08-123, p. 6 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522 (citations omitted).
 

 On appeal, and in the proceedings below, Mr. Hayes asserted that the gun accidentally discharged as a result of Ms. Striggs’s banging his arm and grabbing the barrel of the gun. Presented with Mr. Hayes’s conflicting testimony regarding
 
 *36
 
 the events that occurred before and after the shooting, the jury made a credibility determination and rejected the defendant’s hypothesis that the shooting was accidental. We find that jurors did not unreasonably or irrationally reject the defense’s construction of the evening’s events.
 

 Ms. Harris’s and Mr. Williams’s testimony together with that of Mr. Larvadain supported a reasonable inference that the shooting was not accidental. Ms. Harris and Mr. Williams, although not eyewitnesses to the actual shooting, each testified that they heard Ms. Striggs yell Mr. Hayes’s name shortly before the shooting. In particular, Mr. Williams, whose telephone conversations were corroborated by telephone records, testified that just before the phone went dead, he heard Ms. Striggs screaming Mr. Hayes’s name while yelling “no”. Mr. Larvadain testified that a few weeks before the shooting Mr. Hayes told Mr. Larvadain that he and Ms. Striggs had been fighting and he wanted to kill her. Although Mr. Larvadain thought Mr. Hayes was joking, nevertheless he was concerned about the statement. The jury also heard testimony from Mr. 114Churchman that this type of weapon did not accidentally discharge unless it was dropped.
 

 Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of La.R.S. 14:80.1 beyond a reasonable doubt. Thus, this assignment is without merit.
 

 Mistrial/Instruction/Closing Argument
 

 Defense counsel objected to trial court rulings concerning Detective Ze-ringue’s testimony. During defense counsel’s cross-examination, Detective Ze-ringue testified that Mr. Hayes had a couple of arrests. Counsel objected to the denial of a mistrial and the failure to give an admonition to the jury. He further asserts on appeal that the adverse rulings, along with the trial judge’s limiting counsel’s closing argument, denied Mr. Hayes the right to a fair trial.
 

 The rulings arose following defense counsel’s question to the detective: “And you checked and isn’t it true that he [Mr. Hayes] has no criminal convictions of any kind?” Detective Zeringue responded: “To my knowledge he just had a couple arrests and that was it; no convictions.”
 

 Outside the presence of the jury, defense counsel asked that the court declare a mistrial because the statement about the arrests was inadmissible and nonrespon-sive to the question. The state responded that defense counsel had previously opened the door to that line of questioning by defense counsel’s cross-examination of Mr. Williams.
 

 During defense counsel’s cross-examination of Mr. Williams, Mr. Williams admitted that he was currently incarcerated for a parole violation until 2013. He also admitted to several felony convictions. In response to defense questions, he testified he did not know the defendant. Counsel asked: “You never find out | ^anything about him?” He answered: “I wasn’t looking for nothing.” Counsel then asked: “Nothing. He’s never been convicted of a thing in his life? You know anything about that?” Mr. Williams answered that he did not know the defendant. The state objected to that line of questioning and the court sustained the objection. Next, defense counsel asked whether he knew why the defendant might be upset with a multiple-convicted felon getting involved with a good woman. Before Mr. Williams answered, the prosecutor objected and the court sustained the objection.
 

 The trial judge denied the motion for mistrial and agreed that defense counsel opened the door by previously eliciting
 
 *37
 
 character evidence regarding Mr. Hayes’s criminal history. Mindful, however, that the specific question of whether or not Mr. Hayes had an arrest was generally not admissible,
 
 [5]
 
 the trial judge considered whether he should cure that by an admonition to the jury. Defense counsel argued that the jury be instructed to disregard arrests at this point as there were no convictions.
 

 The trial judge, however, believed that if he were to give the jury the admonition, then defense counsel would argue to the jury in closing that Mr. Hayes had no criminal history. Therefore, the trial judge ruled that because defense counsel opened the door to the testimony, the statement would remain with no admonition. The trial judge then imposed a limitation on closing argument. He instructed the prosecutor that in the event defense counsel argued Mr. Hayes’s good character and that Mr. Hayes had no arrests, then on rebuttal, the prosecutor would be able to rebut that allegation. However, the trial judge would not allow the prosecutor to refer to arrests in the state’s initial closing argument.
 

 11fiDefense counsel resumed questioning Detective Zeringue. Defense counsel asked: “The question to you, Detective Zeringue, is does the defendant have any criminal convictions for anything?” The officer responded: “No, sir.” Defense counsel asked whether she would be in a position to know that. She responded that she had access to his rap sheet and it did not show any convictions.
 

 Thereafter, defense counsel and the prosecutor were presented with the trial judge’s jury charges. No limiting instruction was given. The defendant did not request any changes.
 

 Preliminarily, we note that now on appeal, counsel argues that his closing argument was limited insofar as arguing the defendant’s lack of any convictions because if he did so, the state would be allowed to argue in rebuttal that the defendant had a criminal record based on these nebulous arrests. Even assuming that the defendant raised an objection below to the limitation of argument, that concern did not arise. During closing, defense counsel argued that the jury had to look at the fact that the defendant “has never been convicted of anything in his life at this point, nothing.” He added: “He’s not known to cause fights. He has no convictions for any batteries or assaults or anything.” In rebuttal, the state did not argue nebulous arrests. Also, the state did not mention arrests in its initial closing statements.
 

 At another point during closing, defense counsel argued that:
 

 And then to get to second degree murder at this point you’ve got to believe that despite the fact that there’s been no problems, no issues, no nothing, that he decides to go out there basically in his night slippers to execute her in a coldblooded fashion, totally contralti [sic] to his personality, his past track record, the events of his life, the experiences his family had at this point with him, and his whole being at this point ...
 

 
 *38
 
 Thus, the prosecutor was not allowed in closing to refer to the detective’s statement that Mr. Hayes had a couple of arrests. However, if defense counsel |17argued in closing that Mr. Hayes had no arrests, the trial judge stated that the prosecutor could use the detective’s statement in rebuttal. Defense counsel’s closing argument was solely limited to that extent. Counsel was not precluded from otherwise arguing Mr. Hayes’s good character, including the lack of convictions, which counsel did extensively argue. Therefore, even assuming counsel preserved an objection, the argument lacks merit.
 

 We now turn to defense counsel’s objections raised below.
 

 Mr. Hayes contends that the trial court should have granted a mistrial due to Detective Zeringue’s testimony regarding the defendant’s previous arrests. He asserts that Detective Zeringue was an experienced police officer who knew that it was improper to mention any arrests that might be on the rap sheet. And the answer was nonresponsive to counsel’s question. The only possible reason for the officer to answer counsel’s question that way was to portray the defendant as a “bad” person who had a criminal history. He argues he was prejudiced by the failure to grant a mistrial and admonish the jury that guilt was to be determined solely on the facts of this case. He also argues the testimony about arrests was not harmless error.
 

 The state responds that the defendant opened the door and that he failed to request a jury instruction to address his concerns.
 

 Absent jurisprudential and statutory exceptions, evidence of other crimes is generally inadmissible
 
 [6]
 
 in the guilt phase of a criminal trial unless the probative value of the evidence outweighs its prejudicial effect and unless other safeguards are met.
 
 State v. Johnson,
 
 94-1379 (La.11/27/95), 664 So.2d 94, 99 (citations omitted). This general rule ensures that a defendant who has committed other 11scrimes will not be convicted of a present offense simply because he is perceived as a “bad person,” irrespective of the evidence of his guilt or innocence.
 
 Id.
 

 However, the introduction of evidence of “good character” places character at issue, thereby permitting the state to cross-examine the defendant’s character witness about his or her knowledge of the defendant’s particular conduct, prior arrests, or other acts relevant to the moral qualities pertinent to the defendant’s crime and to introduce evidence of the defendant’s bad character in rebuttal of the testimony of the defendant’s character witness.
 
 State v. Taylor,
 
 07-869, p. 6 (La.App. 5 Cir. 4/29/08), 985 So.2d 266, 268, citing among other cases
 
 State v. Rault,
 
 445 So.2d 1203 (La.1984),
 
 cert. denied,
 
 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984).
 

 In
 
 Taylor, supra,
 
 07-869, pp. 6-7, 985 So.2d at 269-70, this Court held that even if the assignment was preserved on appeal, character evidence was properly admitted because counsel opened the door. Defense counsel questioned a witness about her knowledge of the defendant’s general reputation in the community thereby opening the door to the state’s questioning the witness whether she was aware that her nephew “was on probation when he was arrested?”
 

 
 *39
 
 We find that counsel opened the door to testimony about the defendant’s criminal history when he asked Mr. Williams whether he knew that Mr. Hayes had never been convicted and then followed the question with whether he knew “anything about that.” Thus, the evidence concerning arrests was properly admitted.
 

 But, even assuming that counsel did not open the door, we find that the defendant was not denied a fair trial.
 

 |lflThe thrust of the defendant’s argument is that he was denied a fair trial because of inadmissible other crimes evidence. Mr. Hayes relies on La.C.Cr.P. arts. 771 and 775 rather than Article 770.
 

 Article 775 pertinently provides:
 

 Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
 

 Article 771, concerning admonition and mistrial provides:
 

 In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
 

 (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
 

 (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
 

 In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
 

 La.C.Cr.P. art. 770(2) is not germane here. The article in pertinent part mandates the granting of a mistrial if a judge, district attorney, or a court official refers within the hearing of the jury referring directly or indirectly to “[ajnother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.” The jurisprudence interpreting this article has held that an impermissible reference to another crime deliberately elicited of a witness by the prosecutor would be imputable to the State and would also mandate a mistrial.
 
 State v. Madison,
 
 345 So.2d 485, 494 (La.1977).
 

 |2nThe unsolicited and unresponsive testimony from a police officer is not chargeable against the state to provide a ground for mandatory reversal of a conviction.
 
 State v. Fowlkes,
 
 352 So.2d 208, 212 (La.1977). Moreover, there is no indication that the detective deliberately uttered the comment about arrests to prejudice the defendant.
 

 Mistrial is a drastic remedy, and is warranted only where remarks result in substantial prejudice sufficient to deprive the defendant of a fair trial.
 
 State v. King,
 
 06-554, p. 15 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 394,
 
 writ denied,
 
 07-0371 (La.5/4/07), 956 So.2d 600 (citation omitted). A determination of whether prejudice has resulted lies within the sound discretion of the trial judge. The decision to grant or deny a mistrial is within the sound discretion of the trial court. The denial of a motion for a mistri
 
 *40
 
 al will not be reversed on appeal unless the trial court has abused its discretion.
 
 Id.
 

 Furthermore, to trigger the need for an admonition the remark must refer to a crime alleged to have been committed by the defendant. It must be an unambiguous reference to crimes alleged to have been so committed.
 
 State v. Hayes,
 
 414 So.2d 717, 721-22 (La.1982)
 

 In
 
 State v. Gordon,
 
 504 So.2d 1135, 1141 (La.App. 5 Cir.1987), counsel objected to the officer’s statements, alleging that the officer testified to other crimes under investigation which the defendant was suspected of having committed. This court found no need for an admonition because neither of the challenged comments was an unambiguous reference to crimes alleged to have been so committed.
 

 In
 
 State v. Celestine,
 
 98-1166 (La.App. 5 Cir. 3/30/99), 735 So.2d 109, 114,
 
 writ denied,
 
 (La.10/8/99), 750 So.2d 178, a police officer testified regarding his identification of the defendant and stated in response to questioning at trial, “And |2twhen I got that name, I ran that subject’s name through the national crime computer and got a pass [sic] criminal history and got a ...” 98-1166 at 6, 735 So.2d at 114. Defense counsel moved for a mistrial, but did not seek an admonition. This Court found no abuse in the trial judge’s refusal to grant a mistrial, stating, “In the present case, the officer did not refer to any specific crime committed by the defendant. He merely stated that he ran the defendant’s name through the national crime computer, got a past criminal history and obtained a photograph.” 98-1166 at 7-8, 735 So.2d at 114.
 

 Similarly, the detective’s nonresponsive answer indicating that Mr. Hayes had been arrested for other crimes did not warrant the drastic remedy of mistrial where any permissible inference referred to ambiguous arrests and the detective did not indicate for what offenses Mr. Hayes might have been arrested on other occasions. Mr. Hayes’s contention that the trial court abused its discretion in failing to admonish the jury to disregard the remark is equally without merit.
 

 Finally, even if the evidence was improperly admitted, the improper admission of other crimes evidence is subject to harmless error analysis under
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and
 
 Sullivan v. Louisiana,
 
 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
 
 Id.
 
 at 96.
 
 Chapman
 
 tests whether it appears “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.”
 
 Id.
 
 at 100, quoting
 
 Chapman,
 
 386 U.S. at 24, 87 S.Ct. at 828.
 
 Chapman
 
 was refined in
 
 Sullivan, supra.
 
 The
 
 Sullivan
 
 inquiry “is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.”
 
 Id.
 
 quoting
 
 Sullivan,
 
 113 S.Ct. at 2081. Furthermore, La.C.Cr.P. art. 921 provides the ^proper scope for appellate review; i.e., a judgment or ruling shall not be reversed due to error unless the error affects substantial rights of the accused.
 
 Id.
 
 at 101.
 

 Considering the strength of this case, particularly Mr. Larvadain’s testimony that a few weeks before the incident, Mr. Hayes threatened to kill Ms. Striggs, and Mr. Williams’s testimony that Ms. Striggs yelled the defendant’s name and “no” shortly before the phone went dead, we cannot say that the trial court’s decision to permit the introduction of other crimes evidence was harmless error beyond a reasonable doubt and that the jury’s verdict was surely unattributable to this error.
 

 
 *41
 
 Accordingly, this assignment lacks merit.
 

 Error Patent
 

 The record was reviewed for errors patent, according to La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Wetland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). Our review for errors patent reveals none requiring corrective action.
 
 See:
 
 La.C.Cr.P. arts. 920, 921.
 

 However, we address defense counsel’s concern expressed in brief that credit for time served was evidently not given.
 
 See
 
 La.C.Cr.P. art. 880. The sentencing transcript and the minute entry do not reflect that Mr. Hayes was given such credit. Such an allowance of credit is mandatory, even for a defendant who is serving a life sentence without benefit of parole, probation or suspension of sentence. La.C.Cr. P. art. 880;
 
 State v. Leeming,
 
 612 So.2d 308 (La.App. 5 Cir.1992),
 
 writ denied,
 
 616 So.2d 681 (La.1993).
 
 See also: State v. Hannon,
 
 98-0957, pp. 1, 12 (La.App. 4 Cir. 5/26/99), 736 So.2d 323, 326, 331,
 
 writ denied,
 
 99-1911 (La.12/17/99), 751 So.2d 872;
 
 State v. Hebert,
 
 96 1884, p. 18 (La.App. 1 Cir. 6/20/97), 697 So.2d 1040, 1050,
 
 writ denied,
 
 97-1892 (La.12/19/97), 706 So.2d 450;
 
 State v. Keys,
 
 29,369, p. 21 (La.App. 2 Cir. 5/7/97), 694 So.2d 1107, 1120,
 
 units denied,
 
 97-1387, 97-1497 (La.10/31/97), 703 So.2d 21;
 
 State v. Guillory,
 
 97-179, pp. 1, 7 (La.App. 3 Cir. 3/11/98), 715 So.2d 400, 403, 405,
 
 writ denied,
 
 98-0955 (La.10/9/98), 726 So.2d 17.
 

 But, the failure of the trial court to give credit for time served requires no corrective measures. La.C.Cr.P. art. 880, as amended by Act 788 of 1997, effective August 15,1997, makes credit for time served self-operating even on a silent record.
 
 State v. McCorkle,
 
 97-966, (La.App. 5 Cir.2/25/98), 708 So.2d 1212, 1219. Thus, the granting of credit for time served has long been self-operating under La.C.Cr.P. art. 880.
 
 State v. Page,
 
 08-531, pp. 17-18 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 453-54,
 
 writ denied,
 
 09-2684 (La.6/4/10), 38 So.3d 299 (citation omitted). Therefore, although the trial judge did not state that the defendant was given credit for time served, credit will be given pursuant to La.C.Cr.P. art. 880 as amended.
 

 Conclusion
 

 For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
 

 CONVICTION AND SENTENCE AFFIRMED
 

 [1]
 

 . The trial judge conducted a
 
 Prieur
 
 hearing,
 
 State v. Prieur,
 
 277 So.2d 126 (La. 1973), after the state noted its intent to introduce evidence of these statements. The judge ruled the evidence was admissible.
 

 [2]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [3]
 

 . Detective Zeringue testified that there was an insufficient amount of DNA on the trigger of the gun so that it could not be tested.
 

 [4]
 

 . 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [5]
 

 . See, La.C.E. art. 609.1(A) and (B):
 

 A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
 

 B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
 

 [6]
 

 . La.C.E. art. 404 provides that evidence of other crimes, acts or wrongs is generally not admissible,